1

2

3

4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7     X.S.,                              Case No.  21-cv-09725-JCS

             Plaintiff,
8                                        **ORDER GRANTING PLAINTIFF'S**
                                         **MOTION FOR SUMMARY**
9        v.                              **JUDGMENT, DENYING**
                                         **DEFENDANT'S MOTION FOR**
10    KILOLO KIJAKAZI,                   **SUMMARY JUDGMENT, REVERSING**
                                         **DECISION OF THE COMMISSIONER**
             Defendant.                  **AND REMANDING FOR AWARD OF**
11                                       **BENEFITS**

12                                       Re: Dkt. Nos. 15, 20

13

14    **I.      INTRODUCTION**

15            On July 12, 2019, X.S.[1] applied for disability benefits under Title II of the Social Security

16    Act alleging disability beginning June 16, 2018.  The claim was denied initially and upon

17    reconsideration, and Mary P. Parnow, an administrative law judge ("ALJ"), held a telephonic

18    hearing on March 9, 2021.  On April 9, 2021, the ALJ denied X.S.'s application and on October

19    21, 2021, the Appeals Council denied X.S.'s appeal of the ALJ's decision, making it the final

20    decision of Defendant Commissioner of the Social Security Administration ("Commissioner").

21    After the Appeals Council denied review, X.S. sought review in this Court pursuant to 42 U.S.C. §

22    405(g).  Presently before the Court are the parties' cross-motions for summary judgment.  X.S.

23    asks the court to reverse the Commissioner's denial of benefits and award benefits, or in the

24    alternative, remand for additional proceedings.  The Commissioner asks the Court to affirm the

25    denial of benefits, or if the Court reverses the denial, to remand for further proceedings rather than

26

27    _____

28    [1] Because opinions by the Court are more widely available than other filings and this Order
      contains potentially sensitive medical information, this Order refers to Plaintiff using only his
      initials.

United States District Court
Northern District of California

awarding benefits.  For the reasons stated below, the Court GRANTS Plaintiff's Motion, DENIES Defendant's Motion, reverses the decision of the Commissioner and remands for award of benefits.[2]

## II.    REGULATORY FRAMEWORK FOR DETERMINING DISABILITY

### A.    The Five-Step Framework

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1).  A claimant is only found disabled if their physical or mental impairments are of such severity that they are not only unable to do their previous work but also "cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act.  *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five.  *Id.*  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Id.*

At step one, the ALJ considers whether the claimant is presently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is engaged in such activity, the ALJ determines that the claimant is not disabled, and the evaluation process stops.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ continues to step two.  *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or combination of such impairments that meets the regulations' twelve-month durational requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  An impairment

United States District Court
Northern District of California

---

[2] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

1   or combination of impairments is severe if it "significantly limits [the claimant's] physical or

2   mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have

3   a severe impairment, disability benefits are denied.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ

4   determines that one or more impairments are severe, the ALJ proceeds to the next step.  *See id.*

5       At step three, the ALJ compares the medical severity of the claimant's impairments to a

6   list of impairments that the Commissioner has determined are disabling ("Listings").  *See* 20

7   C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination

8   of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is

9   disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

10      At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and

11  past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The RFC is "the most [a claimant] can still

12  do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's]

13  case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then determines whether, given the claimant's

14  RFC, the claimant would be able to perform their past relevant work.  20 C.F.R. § 404.1520(a)(4).

15  Past relevant work is "work that [a claimant] has done within the past fifteen years, that was

16  substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."

17  20 C.F.R. § 404.1560(b)(1).  If the claimant is able to perform their past relevant work, then the

18  ALJ finds that they are not disabled.  If the claimant is unable to perform their past relevant work,

19  then the ALJ proceeds to step five.

20      At step five, the Commissioner has the burden to "identify specific jobs existing in

21  substantial numbers in the national economy that the claimant can perform despite [the claimant's]

22  identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v.*

23  *Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner meets this burden, the

24  claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and

25  entitled to benefits if there are not a significant number of jobs available in the national economy

26  that the claimant can perform.  *Id.*

27  **B.    Supplemental Regulations for Determining Mental Disability**

28      The Social Security Administration has supplemented the five-step general disability

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1  evaluation process with regulations governing the evaluation of mental impairments at steps two

2  and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a.  First, the Commissioner

3  must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R.

4  § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation

5  resulting from the claimant's mental impairment with respect to the following functional areas: 1)

6  understand, remember, or apply information; 2) interact with others; 3) concentrate, persist, or

7  maintain pace; and 4) adapt or manage oneself.  20 C.F.R. §§ 404.1520a(b)(2), (c)(3).  Finally, the

8  Commissioner must determine the severity of the claimant's mental impairment and whether that

9  severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. §

10  404.1520a(d).  If the Commissioner determines that the severity of the claimant's mental

11  impairment meets or equals the severity of a listed mental impairment, the claimant is disabled.

12  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the evaluation proceeds to step four of the general

13  disability inquiry.  *See* 20 C.F.R. § 404.1520a(d)(3).

14        Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the

15  presence of various listed mental impairments, but all listed mental impairments share certain

16  "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity

17  criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Any medically determinable

18  mental impairment—*i.e.*, one that satisfies the Paragraph A criteria of one or more listed mental

19  impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general

20  Paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme'

21  limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  *Id*. at

22  12.00(A)(2)(b).  A claimant has a "marked" limitation if the claimant's "functioning in this area

23  independently, appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R.

24  § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d).  A claimant with an "extreme" limitation is "not able

25  to function in this area independently, appropriately, effectively, and on a sustained basis."  20

26  C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(e).

27        This evaluation process is to be used at the second and third steps of the sequential

28  evaluation discussed above.  Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The

adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").  If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520a(d)(3).

## III.   BACKGROUND

### A.   Factual Background

X.S. was a fifty-year-old man at the time of his alleged onset date.  Admin. Record ("AR") 62.  He completed ninth grade and subsequently earned a GED.  AR 46.  At the time of the hearing, he lived in San Francisco with a family friend and his girlfriend.  AR 193, 534. He stated on an adult function report dated August 8, 2019 that he cares for his 7-year old daughter but receives help from his ex-wife, who drives his daughter to and from school.  AR 200.

At the time of the administrative hearing, in March 2021, X.S. was unemployed.  AR 46. Previously, he worked in a Costco warehouse (2006 to 2007, about one year, working 40 hours a week); as a wireless advocate salesperson (2006 to 2011, about five years, working 40 hours a week); as a cashier at Ross (2014, less than a year, working 40 hours a week); in a warehouse for Aerotek, Inc. (2014, less than a year, working 40 hours a week); as a service advisor at South Bay Honda (December 26, 2015 to July 20, 2018, working 40 hours a week).  X.S. also worked as a service advisor at Honda of Oakland starting June 29, 2018 and listed this job as his employment until November 10, 2020. AR 260, 264.  However, as discussed below, the record reflects that X.S. was out on disability starting in the fall of 2018 and that he had no earnings in 2019, 2020 or 2021.  AR 186, 190.

### B.   The ALJ's Decision

At step one, the ALJ concluded that X.S. had not engaged in substantial gainful activity since June 16, 2018.  AR 24.  The ALJ acknowledged that X.S. earned $24,312 in 2018 and that treatment records indicated that X.S. continued to work after his alleged June 16, 2018 onset date, but found that "some evidence" supported the conclusion that "the claimant's duties were

modified after the alleged onset date." AR 24.   Therefore, the ALJ gave X.S. "the benefit of the doubt that substantial gainful activity-level earnings occurred prior to the alleged onset date."  AR 24.

At step two, the ALJ determined that X.S.'s lumbar spine degenerative disc disease, prostate cancer, left foot degenerative joint disease of the first MTPJ, right lateral epicondylitis, right wrist degenerative joint disease with cartilage damage, left shoulder degenerative joint disease, obstructive sleep apnea, obesity, and major depressive disorder constituted severe impairments that "significantly limit the ability to perform basic work activities."  AR 24.

At step three, the ALJ found that, even in combination, X.S.'s impairments did not meet or equal in severity the listed impairments, specifically considering Listings 1.02 (major joint dysfunctions), 1.04 (disorders of the spine), and 12.04 (mental disorders).  AR 25.  The ALJ noted that though "there is no listing associated with obesity, this impairment has been considered in combination with the coexisting impairments in making the above finding."  AR 25.

At step four, the ALJ found that X.S. had the RFC to perform:

> medium work . . . except he's limited to no more than frequent reaching overhead and in other directions with the right upper extremity; no more than frequent reaching with the left upper extremity; no complex and detailed tasks; understanding, remembering, and carrying out simple routine tasks in a routine work environment; no more than occasional contact with coworkers, supervisors, and the general public; and the need for ready access to a restroom.

AR 25–26.  In reaching this RFC, the ALJ found that X.S.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms but that his "statements concerning intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  AR 27.

The ALJ also addressed the persuasiveness of the medical opinions in the record.  She found the opinions of the state agency medical consultants, Drs. Ruo and Rowlands, who conducted records reviews, to be "generally persuasive" regarding X.S.'s ability to do medium work.  AR 32.  The ALJ noted that Dr. Ruo opined that the claimant could perform the "full range of medium work," citing to medical evidence of "sleep apnea, a history of right wrist arthroscopy,

6

and right lateral epicondylitis, but noting that there was no evidence suggesting that recommended prostatectomy was performed for asymptomatic and non-metastatic prostate cancer." AR 32. Dr. Rowlands "generally agreed" with Dr. Ruo's opinion but opined that they would add the "additional limitation of frequently reaching laterally and overhead with the right upper extremity, as well as frequent handling," based on an "MRI showing multilevel degenerative and discogenic disease in the lumbar spine, and findings such as right wrist swelling and diffuse tenderness to palpation over the distal radius and ulna." AR 32. The ALJ found the two opinions to be "generally consistent with each other, as well as with the largely normal objective medical findings." AR 32. The ALJ, giving "generous consideration" to the claimant's "subjective symptoms . . . to the degree reasonably consistent with the objective findings . . . [of] medical evidence received at the hearing level," added another limitation to the range of work X.S. could perform by "limiting the claimant to frequent reaching in all directions with the bilateral upper extremities." AR 32.

The ALJ found "less persuasive overall" the opinions of Drs. Park, Schane, and Lin, who offered opinions about X.S.'s postural limitations. AR 32. The ALJ explained that Dr. Park "opined that for a brief period of less than two weeks in November 2018, the claimant was capable of standing, walking, sitting, and driving intermittently (defined as up to 50% of his shift); occasionally (defined as up to 25% of his shift) bending at the waist and twisting the torso or spine; intermittently squatting or kneeling or knee bending; and lifting, carrying, pushing, or pulling no more than 10 pounds (e.g., Ex. 10F: 140)." AR 32. Dr. Schane "gave the same opinion in November 2018 (Ex. 10F: 184)," and similarly, Dr. Lin opined on multiple occasions that "for short periods of a week or less in October 2018, with the same definitions above, that the claimant could intermittently stand and walk; occasionally bend at the waist and twist the torso or spine; never climb ladders, use scaffolds, or work at heights; and was limited to lifting, carrying, pushing, or pulling no more than 20 pounds (e.g., Ex. 10F: 141, 145, 169, 177)." AR 32. The ALJ concluded that these opinions regarding X.S.'s postural limitations were "less consistent with and less supportable by the . . . largely normal objective findings, including full motor strength, normal gait, and negative imaging of the bilateral knees," combined with the "claimant's relatively

1    intact daily activities, including the capacity to drive and to take public transportation and walk to

2    travel to appointments, as well as to obtain new employment and continue working and running

3    errands."  AR 32.

4          With respect to X.S.'s mental limitations, the ALJ found the psychological consultative

5    examiner's opinions "partially persuasive."  AR 32.  The examiner, Dr. Cleary, found X.S. to be

6    moderately impaired "in performing detailed and complex tasks, performing work activities on a

7    consistent basis without special or additional instruction, maintaining regular attendance and

8    completing a normal workday or workweek without interruptions from psychiatric condition, and

9    dealing with the usual stress encountered in the workplace."  AR 32.  Additionally, Dr. Cleary

10    noted mild impairment "in performing simple and repetitive tasks, accepting instructions from

11    supervisors, and interacting with coworkers and the public (Ex. 4F)."  AR 32.  The ALJ found Dr.

12    Cleary's opinions to be "essentially consistent with limiting the claimant to simple routine tasks in

13    a routine work environment as described in the above [RFC]," which was consistent with and

14    supportable by "the medical evidence, including largely normal findings on mental status

15    evaluation and little in the way of documented mental health treatment."  AR 32–33.  The ALJ,

16    however, decided to further limit X.S. to "no more than occasional contact with coworkers,

17    supervisors, and the general public, and moderate difficulties interacting with others" because "the

18    medical evidence received at the hearing level, including Dr. Cleary's own observations, such as

19    that the claimant was somewhat verbose and tangential, with disorganized stream of mental

20    activity and poor judgment," and X.S.'s "problems with anger and irritability," supporting

21    heightened limitations.  AR 33.

22          Regarding the last set of opinions on mental limitations, the ALJ found "generally

23    persuasive" the assessments of Drs. Tyl and Kadakkal, who performed records reviews.  AR 33.

24    Both assessed X.S. as having "mild difficulties understanding, remembering, or applying

25    information; moderate difficulties interacting with others; moderate difficulties concentrating,

26    persisting, or maintaining pace; and moderate difficulties adapting and managing oneself."  AR

27    33.  According to the ALJ, the agency consultants "opined the claimant was limited to

28    concentration, persistence, or pace and adaptation for simple, one- to two-step tasks with limited

1    contact with others," cited "medical evidence, such as documented effective or anxiety

2    symptoms," and made "findings such as somewhat verbose and tangential speech, edgy mood,

3    anxious affect, agitation, hypomanic presentation and inability to spell the word world backward."

4    AR 33.  The ALJ opined, however, that the consultants' findings were "otherwise largely normal .

5    . . on mental status evaluation, such as intact ability to perform serial seven calculations without

6    difficulty, intact ability to follow a three-step command, and adequate hygiene, as well as recent

7    medical records showing that the claimant was not generally agitated or hostile at the doctor's

8    office (Exs. 1A, 3A)."  AR 33.  The ALJ found these opinions consistent with each other, and

9    generally consistent with and supported by the medical evidence.  AR 33.

10         As a final note on the medical opinions, the ALJ mentioned that Dr. Schane had opined

11   that X.S. should be excused from jury duty for one year for medical reasons, but the doctor had

12   failed to "describe specific functional limitations."  AR 33.

13         At step five, the ALJ determined that X.S. could not perform his past relevant work and

14   that "the claimant's ability to perform all or substantially all of the requirements [of the full range

15   of medium work had been] impeded by additional limitations."  AR 34, 35.  Nevertheless, the ALJ

16   found based on the testimony of the vocational expert ("VE") that X.S. could perform a modified

17   range of medium work as Industrial Cleaner, Stores Laborer, and Laundry Worker and that these

18   jobs exist in the national economy for an individual with the claimant's age, education, work

19   experience, and residual functional capacity.  AR 35.  The ALJ thus found X.S. not disabled.  AR

20   35.

21   **IV.    ISSUES FOR REVIEW**

22         X.S. seeks reversal of the Commissioner's denial of benefits on two grounds.  First, he

23   contends the ALJ erred because she did not adequately account for X.S.'s frequent need to use the

24   restroom.  Second, he asserts that the ALJ erred in rejecting X.S.'s testimony as to the limitations

25   caused by his right wrist pain.  As to both errors, X.S. asserts there should have been additional

26   limitations in his RFC and that as a result of the ALJ's failure to include such limitations, the

27   testimony of the VE does not provide substantial evidence to support the ALJ's conclusion at step

28   five that X.S. is not disabled.

United States District Court
Northern District of California

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# V.     ANALYSIS

## A.    Standard of Review

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).  When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free of legal error and supported by "substantial evidence."  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (internal citation omitted).  Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

## B.    Whether the ALJ Erred in Failing to Adequately Account for Frequent Need to Use the Restroom

### 1.  Background

At the administrative hearing, the ALJ asked X.S. if he had any symptoms associated with his prostate cancer.  AR 52.  X.S. testified that he did, describing them as follows:

> Well. I've urinated on myself a few times, I constantly have to use the restroom, at least a couple of times every hour.  And it actually is giving me problems even going, like, number two making it to the restroom sometimes. And so, it's a control of urination, mostly, and having to go, urgency.

AR 52.  The ALJ followed up with two more questions, asking X.S. to confirm his testimony that he urinates at least twice an hour and that the need is "urgent."  AR 52.  X.S. confirmed that testimony, adding that "sometimes I don't make it and I actually have gone on myself . . . ."  AR

52.

There is no further testimony by X.S. in the record on this question but the VE, Michael

Frank, offered testimony at the hearing about the possible impact of the frequent need to urinate

on the jobs X.S. could perform.  In particular, the ALJ asked the VE a series of questions posing

hypotheticals that included the need for ready access to a bathroom:

> Q:  For my first hypothetical I'd like you to assume an individual . .
> . . capable of medium work, no more than frequent reaching
> overhead and in other directions with the right upper extremity, and
> that's the dominant upper extremity.  This individual is precluded
> from complex and detailed tasks and instructions but remains
> capable of understanding, remembering, and carrying out simple,
> repetitive tasks in a routine work environment with no more than
> occasional contact with coworkers, supervisors, and the general
> public.  *And would need ready access to a restroom.*  Would that
> individual be able to perform any past work?
> A:  Let me see here.  No . . . . no past work.
> Q:  And is the individual capable of other work in the national
> economy? . . . .
> A:  At medium, correct?
> Q:  Correct.
> A:  One more thing.  *OSHA does require the employer make a
> restroom readily accessible.*  Okay.
> Q:  Thank you.
> A:  So, that's a Government requirement.

AR 56 (emphasis added).  Based on this hypothetical, the VE provided the recommendations of

cleaner II, industrial cleaner, and hand packager.  AR 57.  Next, the ALJ posed a hypothetical that

"took all of hypothetical number one and added the left upper extremity is reduced to frequent

reaching," instead of constant reaching.  AR 58.  The VE testified that such an individual could

work as an industrial cleaner, stores laborer, and laundry worker.  AR 58.

Counsel for X.S. posed a third hypothetical to the VE, adding to the ALJ's first

hypothetical a requirement "that the individual must not only be provided ready access to a

restroom, but also be permitted to take [bathroom] breaks at will up to 15 times a day."  AR 60.

The VE testified that with this additional limitation, none of the jobs he had listed in response to

the ALJ's hypotheticals would be available.  AR 60.  In reaching this conclusion, the ALJ

assumed that the 15 bathroom breaks would have an average duration of 10 minutes each.  AR 60.

Using this assumption, the VE concluded that such a hypothetical individual would need to spend

11

1    "too much time off work."  AR 60.

2            In the ALJ's decision, she found that there was "little documented evidence overall of

3    significant symptoms and functional limitations arising from prostate cancer during the relevant

4    period, *other than for frequent need to use the restroom*."  AR 29 (emphasis added).   The ALJ did

5    not define "frequent" in this context; nor did she discuss X.S.'s testimony that the need to urinate

6    was "urgent" or specifically state that she found this testimony was not credible. As discussed

7    above, the only limitation relating to X.S.'s frequent need to urinate included in the RFC was "the

8    need for ready access to a restroom."

9                     **2.  Discussion**

10           X.S. argues that in light of the ALJ's finding that his prostate cancer was a severe

11   impairment that caused a "frequent need to use the restroom," she erred by not including in X.S.'s

12   RFC limitations that reflected that symptom, including the amount of time away from work he

13   would need for bathroom breaks and the unpredictability of the breaks he would require with

14   respect to timing.  The Court agrees.

15           *Woods v. Comm'r Soc. Sec. Admin.*, No. 6:14-CV-01766-HZ, 2015 WL 8780538 (D. Or.

16   Dec. 14, 2015) is closely on point.  There, the claimant testified that his medication caused him to

17   need a restroom break every 20-30 minutes. 2015 WL 8780538, at *3.  The ALJ discounted the

18   claimant's credibility but accepted his testimony that he required restroom breaks every 20

19   minutes and explained that this need was accounted for in the RFC by a requirement that the

20   claimant have ready access to a restroom.  *Id.*  The ALJ went on to find the claimant not disabled

21   based on testimony by the VE about jobs that could be performed by a hypothetical individual

22   whose limitations included the need for ready access to a restroom.  *Id.*   The court, however,

23   found that the Commissioner's burden at step five had not been met because "the ALJ did not pose

24   a hypothetical to the VE that included all of Plaintiff's limitations."  *Id.*   In particular, the court

25   explained, the ALJ should have asked the VE "whether or not there were jobs that Plaintiff could

26   perform, despite requiring restroom trips every 20 minutes."  *Id.*

27           The judge in *Woods* acknowledged that in *Hopper v. Colvin*, No. 6:13-CV-01525-HZ,

28   2014 WL 6473566  (D. Or. Nov. 14, 2014), he found that "the ALJ did not err by including

United States District Court
Northern District of California

12

1    identical language in the RFC, limiting the claimant to 'ready access to a restroom but not with a

2    frequency that would affect productivity.'" *Id.* He distinguished *Hopper*, however, on the basis

3    that in that case, the claimant testified only "that because of a medication, when he needed to use a

4    restroom, he needed to be close to the restroom because the need was urgent" but "[n]either the

5    medical record nor the claimant's testimony . . .  supported any conclusion about the frequency of

6    the claimant's restroom trips." *Id.*   In contrast, the court explained, in *Woods* the claimant

7    "testified that he required frequent restroom trips and the ALJ adopted [the claimant's]

8    testimony[,] . . . provid[ing] no explanation, [and] . . . point[ing] to [no] evidence in the record, to

9    support the conclusion that such trips would not affect productivity." *Id.*

10       The court in *Ledesma v. Berryhill*, No. SACV 16-882-AGR, 2017 WL 2347181 (C.D. Cal.

11   May 30, 2017) reached a similar conclusion.  In that case, "[t]he ALJ found that [the claimant]

12   ha[d] 'unexpected episodes of diarrhea and bowel urgency secondary to his irritable bowel

13   syndrome, diverticulosis and diverticulitis[ ]' . . . and [the] ALJ translated this limitation into an

14   RFC assessment that required ready access to a restroom."   2017 WL 2347181, at *5. Citing

15   *Woods*, the court found that the ALJ had erred, explaining:

16          The ALJ appears to have conflated different types of limitations.
           Ready access to a bathroom is distinct from the question of whether a
17          claimant needs (a) unexpected bathroom breaks or, as one ALJ put it,
           "freedom to go on an unpredictable schedule as needed;"6 and/or (b)
18          bathroom breaks that may exceed the number or duration of normal
           breaks during the workday.
19

20   *Id.*  The court therefore reversed the decision of the Commissioner that the claimant was not

21   disabled.

22       The reasoning in *Woods* and *Ledesma* also applies here.  The ALJ made an express finding

23   that X.S. had a frequent need to use the restroom, apparently adopting X.S.'s testimony that he had

24   an urgent need to use the restroom at least twice an hour yet translated that symptom into a

25   limitation that accounts for neither the time away from work X.S. would need for bathroom breaks

26   or the unpredictability of those breaks. As a result, the testimony of the VE in response to the

27   ALJ's hypotheticals does not provide substantial evidence that X.S. could perform the jobs listed

28   by the ALJ in her decision.  Moreover, it is apparent from the VE's testimony in response to the

United States District Court
Northern District of California

13

1   hypothetical posed by X.S.'s attorney, adding the need to take 15 bathroom breaks during the

2   workday, that the failure to include such a limitation was not harmless.  To the contrary, the VE's

3   testimony that such a hypothetical individual could not perform any of the jobs previously listed

4   by the VE, points to the opposite conclusion.

5           In her motion, the Commissioner did not address *Woods* or *Ledesma*, relying on a single

6   case to argue that the ALJ adequately accounted for X.S.'s need to take frequent bathroom breaks,

7   *Taylor v. Astrue*, No. C12-1069, 2013 WL 607436, (W.D. Wash. Jan. 28, 2013). *See*

8   Commissioner's Motion at 4. That case, however, is clearly distinguishable.   In *Taylor*, the

9   plaintiff argued that the Commissioner erred by failing to account for any non-exertional

10   limitation in connection with his Crohn's disease – an impairment the ALJ found to be severe –

11   "such as provision for bathroom access other than normal breaks at two-hour intervals[.]"  2013

12   WL 607436, at * 2.  The plaintiff relied on a statement by one of his doctors in a function report

13   that "[t]he workplace environment would need to be aware of his Crohn's disease[,]" but the

14   doctor did not list any specific limitations in connection with that condition, even though the

15   doctor "specifically mentioned 'adequate breaks and rest periods' in association with [the]

16   plaintiff's walking and standing limitation."  *Id.* (quoting administrative record). The court found

17   that the plaintiff's contention that the doctor "contemplated a work restriction associated with his

18   Crohn's disease [was] no more than speculative."  *Id.*   The court concluded that the ALJ's

19   interpretation of the doctor's function report was reasonable and that there was evidence in the

20   record to support it and therefore rejected the plaintiff's argument that additional limitations

21   related to his Crohn's disease should have been included in his RFC.  *Id.*

22           In contrast, the ALJ in this case made a specific finding that as a result of X.S.'s prostate

23   cancer he had a need for frequent bathroom breaks.  She simply failed to account for that need in

24   X.S.'s RFC.  *See Bronson v. Berryhill*, No. 316CV00319LRHWGC, 2017 WL 2972331, at *7 (D.

25   Nev. July 12, 2017), report and recommendation adopted, No. 316CV00319LRHWGC, 2017 WL

26   3427963 (D. Nev. Aug. 9, 2017) (distinguishing *Taylor* in case where the "ALJ . . . specifically

27   noted there [was] support for a functional limitation of unscheduled bathroom breaks" but

28   "accounted for this [only] by incorporating into the RFC a limitation that [the claimant] be in close

United States District Court
Northern District of California

14

proximity to a restroom" and finding that the ALJ had erred by failing to "address how much time [the plaintiff] would be off task as a result of taking unscheduled breaks due to her gastrointestinal issues."). The Court therefore concludes that the Commissioner's reliance on *Taylor* is misplaced and that the ALJ erred by failing to adequately account for X.S. frequent need to use the restroom in his RFC.

### C.   Whether the ALJ Erred in Rejecting X.S. Testimony Regarding Right Wrist Symptoms

#### 1.   Background

On December 12, 2018, X.S. came to the urgent care at Kaiser's main South San Francisco campus, reporting that he had slipped on a hose at a gas station and fallen. AR 331, 337. He presented with pain in his left shoulder, knees, and right wrist and hand. AR 338. He was seen by Dr. Stafford, who conducted a physical exam and observed, *inter alia*, tenderness of the right wrist at the distal radius and ulna and snuffbox but no swelling or deformity overall; and diffuse tenderness over the dorsal right hand at the third and fourth fingers, but no mallet deformity. AR 338. X-rays of the right hand and wrist came back negative for fracture. AR 335. Dr. Stafford assessed the right wrist to be sprained and she prescribed a thumb spica splint and a follow up appointment in two weeks to take more x-rays. AR 338.

On December 26, 2018, X.S. returned to Dr. Stafford for a follow-up appointment to check and x-ray his right hand and wrist. AR 332. The record reflects that X.S. had been wearing the wrist brace "without improvement," and he experienced continued swelling and new stiffness, but no numbness, tingling, or weakness. AR 332. There appeared to be "mild swelling" in the right wrist, and tenderness over the distal radius and ulna, and the snuffbox, with a limited range of motion due to pain, although the fingers appeared to function at full strength. AR 332. X-rays revealed "no definite acute displaced fracture," but Dr. Stafford recommended taking an MRI if snuffbox tenderness continued. AR 333. Dr. Stafford also replaced the previous brace with one made from fiberglass and referred X.S. to orthopedics for further evaluation. AR 333.

The orthopedics appointment occurred on January 2, 2019, when X.S. saw James Johnson, M.D. AR 331. X.S. was still wearing a brace when he was seen by Dr. Johnson and continued to

United States District Court
Northern District of California

1   remain home from work.  AR 331.  Dr. Johnson removed the splint and noted some tenderness

2   around the wrist but minimal swelling, if any, and no ecchymosis.  AR 331.  He observed that the

3   fingers worked well but with some hesitancy, and X.S. had some flexion extension and forearm

4   rotation without any distinct limitation to those actions.  AR 331.  Finally, Dr. Johnson noted that

5   X.S. appeared tender at a majority of areas tested around the wrist and that X.S. should return soon

6   for a follow-up. AR 332.  He recommended X.S. use the wrist as much as possible and gave him a

7   neoprene brace in addition to scheduling an appointment with the orthopedic department's hand

8   therapist.  AR 332.

9          The appointment with the hand therapist occurred on January 9, 2019, when X.S. was seen

10  by Shivangi Dave, O.T.  At that appointment, X.S. reported that he felt "wrist pain localized near

11  the scaphoid snuffbox extending up to 1/3rd distal forearm," and "dorsal radial sided wrist pain."

12  AR 329.  Although O.T. Dave opined that X.S.'s rehabilitation potential was "good," her

13  examination revealed tenderness "over the 1st dorsal compartment" as well as the distal radial

14  ulnar joint, and pain with a "[posterior-anterior] translation in forearm pronation position." AR

15  330.  Finkelstein and Tinel tests were negative, as were tests for both ulnar fovea and impaction.

16  AR 330.  O.T. Dave recommended some exercises and activities for X.S. to do at home for range

17  of motion improvement at the thumb and wrist and recommended that X.S. minimize the use of

18  the wrist brace.  AR 330.

19         On January 23, 2019, Dr. Johnson put X.S.'s forearm in a short cast to address pain in his

20  wrist and arm, removing it at a March 1, 2019 appointment.  AR 319-320, 324.  On April 4, 2019,

21  X.S. was seen by O.T. Dave, who observed that X.S. continued to have pain in his wrist and that

22  he reported dropping a plate the night before because of the pain in his wrist.  AR 312-313.  She

23  noted that X.S. was making "[s]low progress."  AR 313.   Similarly, at an April 11, 2019

24  appointment, Dr. Johnson noted that X.S. still had "a lot of pain" in his wrist.  AR 310.  He

25  recommended that arthroscopic surgery be performed on X.S.'s right wrist and X.S. agreed.  AR

26  310.  Arthroscopic surgery was performed on X.S.'s right wrist on May 20, 2019.  AR 300-301.

27         Following his wrist surgery, X.S. was doing well but in July 2019 he experienced a "new

28  episode of pain and swelling."  AR 278.

1    In an adult function report dated August 8, 2019 ("Function Report"), X.S. reported that

2    his wrist caused him "a lot of pain" and that personal care, such as dressing and bathing were

3    "very difficult" due to pain in his "wrist, hand and back."  AR 193, 194.  He reported that he never

4    prepared food or meals for himself because "it hurt [him] to use [his] hand and wrist."  AR 194.

5    Similarly, he stated that he never did house or yard work because his "hands, wrist and back . . .

6    hurt too much," and that his girlfriend did "everything for [him]."  AR 194.  In response to the

7    question, "If you do any shopping, do you shop (Check all that apply): ☐ In stores  ☐ By phone  ☐

8    By mail  ☐ By Computer" X.S. checked the box for "In stores."  However, in the follow-up

9    question, "Describe what you shop for" he clarified that his "girlfriend does all the shopping" and

10   he responded N/A to the question" How often do you shop and how long does it take?"  AR 196.

11   X.S. checked "yes" in response to the question, "When going out, can you go out alone?" AR 196.

12   However, in response to a question asking whether he had "noticed any unusual fears or

13   behavior[,]" he responded that he "feared . . . leaving [his] girlfriend, and daughter, family, alone."

14   AR 199.

15   At the administrative hearing, the ALJ asked X.S. to describe the "problem" with his right

16   hand.  He testified "Well, I can't write, I can't really use a computer too much or I can't lift much

17   because I drop things." AR 53.  The ALJ asked why he dropped things, and X.S. answered,

18   "Basically I lose grip on things. It's just it feels too heavy and it starts to feel a pain by the wrist

19   and also on my elbow. And I have arthritis on my index finger which really hurst and irritates. So,

20   I end up not being able to hold much weight on that." AR 53.

21   In her decision, the ALJ found that X.S.'s right wrist degenerative joint disease with

22   cartilage damage was a severe impairment.  AR 24. She further found generally that X.S.'s

23   impairments "could reasonably be expected to cause the alleged symptons[.]"  AR 27.

24   Nonetheless, despite X.S.'s pain testimony relating to his right wrist, the ALJ did not include any

25   limitation in X.S.'s RFC related to finger or handling.  AR 25.  She discounted his testimony about

26   the severity of his symptoms on the basis that: 1) his "daily activities are inconsistent with

27   functional limitations to the degree alleged[;]" 2) he "failed to schedule medically recommended

28   MRI; declined physical therapy appointments; generally denied joint pain and decreased range of

17

1   motion of the neck, fatigue, weakness, or numbness; and treating notes state that the claimant did

2   not appear to be in a lot of pain, suggesting milder symptoms that alleged (e.g., [AR 294, 357,

3   646, 704])[;]"  3) he "admitted that prescribed exercises were helpful when he performed them

4   consistently, he was able to progress in his home exercise program without pain or issue and

5   progressed well toward meeting his physical therapy goals, and he was able to return to work on

6   modified duty, consistent with effective treatment ([AR 359])[;]" 4)  he "reported pain severity at

7   a 10 out of 10, both at its best and its worst, raising the question of whether he tended to overstate

8   his symptoms ([AR 741])[;]" 5) there were "inconsistencies" in his testimony (*e.g.,* he "reported

9   that he was able to go out alone, yet he stated in the same function report that he needed someone

10  to accompany him when going places" and he "also stated he was able to shop in stores, yet he

11  also stated in the same report that his girlfriend did all the shopping (e.g., [AR 193-200])[;]" and

12  6)  he "frequently sought medical notes excusing him from work and jury duty, raising the

13  question of whether he sought treatment to generate evidence for this disability application and

14  appeal, rather than in a genuine attempt to obtain relief from allegedly disabling symptoms," and

15  "these notes were generally for very short periods and medical sources at times issued these notes

16  with hesitation, noting a lack of evidence for disability, as well as that the claimant became

17  agitated when clinicians declined to provide the documentation he requested (e.g., [AR 322, 380,

18  548, 559, 643, 686-687, 704, 790-837,  961])[.]" AR 31.

19          **2.  Discussion**

20          In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis.

21  *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).  The ALJ must first determine "whether

22  the claimant has presented objective medical evidence of an underlying impairment which could

23  reasonably be expected to produce the pain or other symptoms alleged." *Treichler v. Comm'r of

24  Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (cleaned up).  If the claimant does so, and

25  there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony

26  as to the severity of the symptoms "only by offering specific, clear and convincing reasons for

27  doing so." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (cleaned up).  "These

28  findings, properly supported by the record, must be sufficiently specific to allow a reviewing court

1    to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not

2    arbitrarily discredit a claimant's testimony regarding pain." *Bunnell v. Sullivan*, 947 F.2d 341,

3    345–346 (9th Cir. 1991) (en banc).  "General findings are insufficient." *Reddick v. Chater*, 157

4    F.3d 715, 722 (9th Cir. 1998).  "Factors that an ALJ may consider in weighing a claimant's

5    credibility include reputation for truthfulness, inconsistencies in testimony or between testimony

6    and conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek

7    treatment or follow a prescribed course of treatment.'"  *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir.

8    2007) (*quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

9        Here, the ALJ found that the first requirement was met as to X.S.'s impairments and

10   therefore, she was required to offer specific, clear and convincing reasons for declining to fully

11   credit X.S.'s testimony about the severity of his symptoms as to his wrist pain.  The ALJ did not

12   do so.

13                    a.   Daily Activities

14       First, the ALJ's boilerplate reference to X.S.'s daily activities, AR 34, is not supported by

15   any examples, let alone examples that relate to X.S.'s testimony about his wrist pain. This is not a

16   specific, clear or convincing for rejecting X.S's pain testimony as it relates to his wrist impairment

17   (or any other impairment).  *See, e.g. Vital v. Colvin*, No. CV 16-923 MRW, 2016 WL 6892395, at

18   *4 (C.D. Cal. Nov. 21, 2016), judgment entered, No. CV 16-923 MRW, 2016 WL 6879248 (C.D.

19   Cal. Nov. 21, 2016) (holding that "the ALJ's boilerplate finding regarding Plaintiff's daily

20   activities was not specific, clear, or convincing" where the ALJ "made no effort to explain how

21   any of those activities materially undermined or were inconsistent with Plaintiff's claims

22   regarding his physical limitations").

23                    b.   Declined Physical Therapy, etc.

24        The second reason offered by the ALJ – that he "failed to schedule medically

25   recommended MRI; declined physical therapy appointments; generally denied joint pain and

26   decreased range of motion of the neck, fatigue, weakness, or numbness; and . . . did not appear to

27   be in a lot of pain [according to some treatment notes], suggesting milder symptoms that alleged"

28   – also is insufficient.   First, all but one of the ALJ's citations to the administrative record are

United States District Court
Northern District of California

1    unrelated to X.S.'s wrist impairment.  *See* AR 294 (noting in a preoperative screening for his wrist

2    arthroscopy that X.S. had no joint pain or decreased ROM in his neck); AR 357 (a 10/31/18

3    treatment note relating to lower back pain X.S. had experienced after a fall); AR 646 (a 2/24/20

4    note from the radiology department that it called three times to schedule a lumbar spine MRI and

5    had not been able to reach X.S.[3]).

6         Further, the only citation to the record offered by the ALJ in support of this reason that

7    bears any relationship to X.S.'s wrist pain is the citation to a treatment note found at AR 704, but

8    this evidence also does not provide clear and convincing support for the ALJ's conclusion.  The

9    ALJ apparently relied on this note to support her finding that X.S. "declined physical therapy

10   appointments."  AR 34.  The ALJ mischaracterizes the record, however.  The treatment note

11   reflects that Dr. Johnson called X.S. on October 2, 2019 to follow up with him about the physical

12   therapy that had been recommended by another doctor for X.S.'s "tennis elbow."  AR 704.

13   According to the note, X.S. told Dr. Johnson that he had received a call telling him that the next

14   appointment was not until November;  however, Dr. Johnson contacted a physical therapist who

15   told him she had offered X.S. an appointment sooner than that but that he could not talk because

16   he was driving.  AR 704. X.S. was then scheduled for physical therapy the next week.  AR 704.

17        There is nothing in the treatment note cited by the ALJ indicating that X.S. "declined"

18   physical therapy.  Further, the possibility that X.S. might have been attempting to avoid

19   scheduling a physical therapy appointment is speculative.  Such a conclusion is also undercut by

20   the fact that with Dr. Johnson's intervention, X.S. was scheduled for physical therapy the next

21   week.  In any event, to the extent the ALJ interpreted this note as indicating that X.S. had declined

22   physical therapy, she needed to explain why she rejected the innocent explanation apparent from

23   the face of the note, namely, that there was a miscommunication with the physical therapist as to

24   scheduling that was resolved when X.S.'s doctor became involved. *See Orn v. Astrue*, 495 F.3d

25   625, 638 (9th Cir. 2007) (holding that while failure to seek treatment may support an inference

26   that a claimant's symptoms are not as severe as claimed, the ALJ may draw such an inference only

27

28   [3] According to a treatment note from a March 2, 2020 visit, X.S. was "waiting on his Orthopeadic recommendations for his right arm" before scheduling the MRI.  AR 644.

*United States District Court*
*Northern District of California*

1  after considering "any explanations that the individual may provide, or other information in the

2  case record, that may explain infrequent or irregular medical visits or failure to seek medical

3  treatment[.]").  In short, this treatment note does not provide substantial evidence that X.S.

4  declined physical therapy appointments and is not a clear and convincing reason for discounting

5  his testimony as to his wrist pain.

6                c.    Progress in Physical Therapy, Ability to Return to Work on Modified
                   Schedule, etc.

7         The third reason cited by the ALJ for discounting X.S.'s symptom testimony, that he

8  "admitted that prescribed exercises were helpful when he performed them consistently, he was

9  able to progress in his home exercise program without pain or issue and progressed well toward

10  meeting his physical therapy goals, and he was able to return to work on modified duty, consistent

11  with effective treatment[,]" also falls short.  The ALJ offers only one citation to the record, AR

12  359, in support of this conclusion and it is a treatment record related to physical therapy X.S.

13  received in connection with a recent fall that had resulted in lower back pain.  AR 359.  It is

14  apparent from the description of the exercises described in the treatment note that they did not

15  involve any hand or wrist therapy.  AR 359.  The ALJ also mischaracterizes the record as to X.S.'s

16  return to work on modified duty, plucking part of a sentence from this treatment note while

17  omitting the second half of the sentence stating, "but his job sent him home because there is a lot

18  of lifting required at work."  AR 359. Further, in the same treatment note it is reported that X.S.

19  "went to work on Friday but had to go home because the pain was so intense."  AR 359.  The ALJ

20  ignored this statement, making no effort to reconcile it with her finding that X.S. was able to

21  return to work on modified duty.  This reason therefore is not a clear and convincing for

22  discounting X.S.'s testimony regarding his wrist pain.

23         The ALJ also found that X.S.'s symptom testimony was not fully credible because he

24  "reported pain severity at a 10 out of 10, both at its best and its worst, raising the question of

25  whether he tended to overstate his symptoms."  AR 34 (citing Ex. 10F: 88 [AR 741]).  This reason

26  also is not clear and convincing.  The ALJ points to a physical therapy treatment note from

27  January 9, 2020 related to treatment for what one doctor had concluded was "tennis elbow" but the

28

*United States District Court*
*Northern District of California*

1    notation concerning pain level is confusing, stating: "Current pain level:  Best 10/10, Worst 10/10,

2    Avg. 10/10."  AR 741.  To the extent all three numbers ostensibly related to X.S.'s "current" pain

3    level, a reasonable interpretation of this notations was simply that his pain was at a constant level

4    during that session.  The 10/10 notation is made even more confusing by the practitioner's

5    description of X.S.'s symptoms in the same treatment note, where she writes, "Elbow pain

6    maintains 5/10 pain throughout the day. Low back pain is now at 5/10."  AR 741.   Taken as a

7    whole, the treatment note cited by the ALJ is unclear as to *what* X.S. may have reported about his

8    pain level and in the absence of any explanation by the ALJ of her interpretation of the note, her

9    reliance upon it is not a specific, clear or convincing reason for discounting X.S.'s pain testimony.

10                    d.   Inconsistencies in X.S.'s Testimony

11           As to the fifth reason offered by the ALJ, that there were "inconsistencies" in X.S.'s

12    testimony, the ALJ mischaracterizes the record.  She offers two examples, both based on X.S.'s

13    responses in the Function Report.  The first example focuses on the fact that X.S. checked the box

14    saying he shopped in stores but went on to state that his girlfriend does all the shopping.  Given

15    that X.S. also answered "N/A" to the follow-up question asking how frequently he shops, the most

16    reasonable interpretation of X.S.'s responses is simply that his shopping is done for him, by his

17    girlfriend, in stores.  The ALJ's conclusion that X.S. had offered inconsistent testimony is not a

18    reasonable interpretation of X.S.'s responses to this series of questions.  Further, to the extent

19    X.S.'s responses relating to the "shopping" questions were ambiguous, the ALJ had a duty to

20    develop the record by asking about them at the hearing.  The Court notes that the ALJ's

21    questioning of X.S. at the hearing was perfunctory and that ALJ did not ask him *any* questions

22    about his activities of daily living.  *See* AR 41-61.  Instead, after asking X.S. about his past work

23    at the outset of the hearing, she left it to X.S.'s counsel to conduct all further questioning of X.S.,

24    taking over again only to elicit testimony from the VE.

25           The second example of an "inconsistency" offered by the ALJ is also taken from the

26    Function Report.  According to the ALJ, X.S. "reported that he was able to go out alone, yet he

27    stated in the same function report that he needed someone to accompany him when going places."

28    AR 31.  This statement is incorrect.  As discussed above, X.S. did check the box stating that he

22

"can" go out alone.  He did not, however, state anywhere in the Function Report that he "needed someone to accompany him when going places."   It may be that the ALJ was relying on X.S.s statement that he "fears . . . leaving [his] girlfriend, and daughter, family alone."  AR 199.  A plausible interpretation of that statement is that X.S. is fearful when he goes places alone, but that interpretation is not obviously inconsistent with his statement that he *can* go places alone.  Therefore, the ALJ's reliance on supposed inconsistencies in X.S.'s testimony is not a specific, clear and convincing reason for discounting X.S.'s testimony about his right wrist symptoms.

e.   Frequently Sought Medical Notes Covering Short Periods and Medical Sources Issued Them with Hesitation

The sixth reason offered by the ALJ for discounting X.S. symptom testimony is that X.S. "frequently sought medical notes excusing him from work and jury duty, raising the question of whether he sought treatment to generate evidence for this disability application and appeal, rather than in a genuine attempt to obtain relief from allegedly disabling symptoms," and "these notes were generally for very short periods and medical sources at times issued these notes with hesitation, noting a lack of evidence for disability, as well as that the claimant became agitated when clinicians declined to provide the documentation he requested (e.g., [AR 322, 380, 548, 559, 643, 686-687, 704, 790-837,  961])."  AR at 31.  The ALJ expanded on this reasoning as to X.S.'s wrist symptoms, stating: "Treating notes also reflect that [X.S.'s] own treating sources suggested that he returned to work or declined his request for extensions, stating that they did not have evidence for weakness and pain of the wrist or disability, seemingly inconsistent with symptoms of the disabling severity alleged (e.g., [AR 322, 358,  379-380, 522])."  The Court finds that this reason is not clear and convincing.

As a preliminary matter, the ALJ's reliance on X.S.'s many requests to be excused from work and jury duty on the basis of his impairments to conclude that he was merely trying generate evidence for his disability appeal and was not "genuinely" seeking relief from disabling symptoms is misplaced as she fails to explain why such repeated requests do not support the opposite conclusion.  Likewise, she does not explain why the short periods of some of the excuses cast doubt on the severity of X.S.'s symptoms given that his doctors repeatedly extended his time off

from work. *See., e.g.,* AR 326 (notation by Dr. Johnson in 1/16/19 treatment note that X.S. had
been unable to work since his injury), 336 (time off extended to 1/2/19 by Dr. Rebecca Shane),
324 (five weeks time off added to work status by Dr. Johnson on 1/23/2019), 278 (2 months time
off added to work status on 7/12/19 by Dr. Johnson).

The Court further finds that the ALJ mischaracterized the record when she stated that
"[X.S.'s] own treating sources suggested that he returned to work or declined his request for
extensions, stating that they did not have evidence for weakness and pain of the wrist or disability,
seemingly inconsistent with symptoms of the disabling severity alleged (e.g., [AR 322, 358, 379-
380, 522])."   The first citation is a February 1, 2019 note from a psychologist describing a request
from X.S. for "disability" from a mental health clinic, which she declined to provide because X.S.
had not been in active treatment in that clinic since September 2018. AR 322.  The provider noted,
however, "patient appears to have been receiving disability from other providers in the Kaiser
system since that time."  AR 322. This evidence, thus, had nothing to do with X.S.'s wrist
symptoms and does not support the ALJ's point.

AR 358 is a treatment note from October 31, 2018 (before X.S. injured his right wrist),
when he was seen for lower back pain.  While it is true that that doctor noted that the MRI of
X.S.'s lumbar spine, physical exam and medication use "didn't correlate with the type of pain
[X.S.] was describing[,]" this observation was not made with reference to X.S.'s wrist pain and
therefore lends only very weak support, if any, to the ALJ's point.

AR 379-380, like AR 322, relates to another request for disability for mental health
reasons.  The note reflects that a Disability Committee recommended "against further extension of
[X.S.'s] disability *for purely psychiatric reasons*."  AR 380 (emphasis added).  This record, like
the one at AR 322, therefore does not support the ALJ's point.

The last citation, to AR 522, does lend some support to the ALJ's conclusion.  There, Dr.
Johnson stated in a September 13, 2019 treatment note that he did "not have evidence for his
disability, the weakness and pain of the wrist" at that time.  AR 522.  Dr. Johnson noted, however,
that when X.S. went back to work he "did not last even 1 hour on the job" because he had "so
much pain and weakness in the wrist that he was unable to do any of his work."  AR 522. Even

United States District Court
Northern District of California

1    this evidence, however, is not clear and convincing as it is not clear what criteria for determining

2    disability Dr. Johnson was applying and there is no indication that he was applying the standards

3    that apply to X.S.'s claim for disability here, which require consideration of the combined effect of

4    all of X.S.'s severe impairments.  The fact that Dr. Johnson did not find that X.S.'s wrist pain

5    alone was disabling is not a clear and convincing reason for declining to credit X.S.'s symptom

6    testimony by failing to include any limitation in his RFC related to fingering and handling.

7    Because the addition of such a limitation might have precluded X.S. from working the jobs

8    identified by the VE and relied upon by the ALJ to find X.S. was not disabled, the Court finds that

9    the error was harmful.

10        **D.    Remedy**

11            "A district court may affirm, modify, or reverse a decision by the Commissioner 'with or

12   without remanding the cause for a rehearing.'" *Garrison v. Colvin*, 759 F.3d at 1019 (quoting 42

13   U.S.C. § 405(g)) (emphasis omitted). "If additional proceedings can remedy defects in the original

14   administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654

15   F.2d 631, 635 (9th Cir. 1981).  On the other hand, the court may remand for award of benefits

16   under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for

17   rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no]

18   outstanding issues that must be resolved before a disability determination can be made" and

19   "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a

20   whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017)

21   (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that

22   a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate

23   case). The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt

24   as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act,"

25   *Garrison v. Colvin*, 759 F.3d at 1021, or when "there is a need to resolve conflicts and

26   ambiguities." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

27            The first requirement is clearly satisfied as to X.S.'s right wrist symptoms for the reasons

28   discussed above.  As to the need for frequent bathroom breaks, the ALJ did not, in fact, reject

United States District Court
Northern District of California

1   X.S.'s testimony.  Nor did she reject any medical opinions on that question.  Instead, she made an

2   express finding that adopted X.S.'s testimony, as discussed above.  To the extent, however, that

3   the ALJ *implicitly* rejected X.S.'s testimony by failing to include a limitation reflecting the time

4   required away from work (as the Commissioner argues, *see* Commissioner's Motion at 4), she

5   failed to provide legally sufficient reasons for doing so.  Indeed, she provided *no* reasons for doing

6   so.  Therefore, the Court finds that the first requirement for awarding benefits is satisfied as to

7   both of X.S.'s challenges to the ALJ's decision.

8        As to the second and third requirements for applying the credit as true rule, there are

9   outstanding issues related to the question of what additional limitations to X.S.'s RFC are

10  appropriate in connection with his right wrist impairment and whether any such additional

11  limitations would give rise to a finding of disability.  Therefore, an immediate award of benefits is

12  not appropriate based on the ALJ's errors as to X.S.'s wrist impairment.  On the other hand, the

13  record is fully developed as to X.S.'s frequent need to use the restroom.  The ALJ found that X.S.

14  has a frequent need to use the restroom based on X.S.'s testimony and did not question his

15  testimony about his need to use the restroom at least twice an hour (much less offer any reason for

16  questioning that testimony).  Given that the VE testified that the addition of a corresponding

17  limitation to the ALJ's hypotheticals would preclude X.S. from working any of the jobs listed by

18  the VE, crediting X.S.'s testimony as true unambiguously establishes disability at step five.  The

19  Court therefore concludes that this is one of the unusual cases in which the credit-as-true rule

20  applies and therefore, that remand for an award of benefits rather than further proceedings is

21  appropriate.

22  **VI.    CONCLUSION**

23       For the reasons stated above, the Court GRANTS Plaintiff's Motion, DENIES Defendant's

24  Motion, and remands for award of benefits.

25       **IT IS SO ORDERED.**

26  Dated:  December 20, 2022

27  _____

28  JOSEPH C. SPERO
    Chief Magistrate Judge

United States District Court
Northern District of California